3-10-0431, City of Ottawa, compellent by John Fleming v. Osmonies, Inc., kept oral and released by Gregory Bird and Robert Mark Chapman. Mr. Fleming, you may proceed. Thank you. May I please have the floor? Counsel. Thank you very much for allowing me to be here this morning. As stated, I'm John Fleming. I'm here to speak on behalf of the City of Ottawa in this case. There are two defendants at police and two separate issues, and I will deal with them separately, having nothing to do with each other. The first issue that I want to touch on and speak about is the Osmonics issue, the case against Osmonics. The court will notice this case pended in the trial court for a number of years, but Osmonics got out essentially on their first motion. It is our position that Judge Lanuti acted hastily in interpreting a few warranty clauses from the Osmonics contract, and he expanded or used too expansive of an interpretation of those to wipe out all claims. We originally had claims for breach of contract for warranty and a separate claim for negligence. We're not here to argue some kind of a weak, thin thread claim that we might still have a warranty claim. The exculpatory clauses, if I said that correctly, there are a couple of terms that are going to be difficult for me to deal with. Exculpation, exculpatory clauses, and intendment. Real words that come out of these cases, and I'll do my best with the pronunciations. But in any event, these clauses may apply to the warranty claims and the contract claims. We're not making that argument here. What we are asking this court and what we are suggesting Judge Lanuti acted too hastily is that we feel that our negligence claim against Osmonics was taken away from us wrongfully. We feel that these warranty, the language in these warranty limitations cannot limit or exculpate Osmonics from our negligence claim. Let me talk about a couple of contract interpretation pieces of law, which I'm sure this court is well aware of, but they are, actually I have to speak very passionate about these because of what they say. They say, first of all, as we all know, the contract was drafted by Osmonics. It's got their big name all across the top. It's this boilerplate language from them. The law says that the first rule is these terms must be construed against Osmonics, in favor of the city of Ottawa and against Osmonics. When it's an exculpatory clause, the cases go even farther. And I would read from the Burwine case. The courts use these three prerequisites, they're called. First of all, there must be a strict construction. These clauses must be strictly construed. Second, here's the intended word, not my words from the court, that they must be read, these exculpatory clauses must be read with every intendment against the party who seeks immunity, with every intendment against Osmonics and in favor of the city of Ottawa. And third, the intent, if they're trying to get out, an exculpatory clause must be spelled out with, the words of the court are, the greatest of particularity. Which brings us to the two cases that we rely strongly upon, the Burwine case and the Tyler case. Burwine is from the federal courts, as is Gates. And the court may have, upon reading these cases, see that there's Gates over here that makes a finding, and there's Taylor and Burwine over here, which hold the opposite. And here's how I submit and suggest the court should look at those, okay? Burwine comes from the federal court, Gates comes from the federal court, they're both attempting to interpret Illinois law. Burwine comes on our way, and Gates may be a little bit more limited. But the one case, talking directly on these issues from the Illinois courts, and I think, if I am not mistaken, it is from this very same third district, is the Tyler case. And the Tyler case adopts Burwine's language, and it uses these contract construction terms, and it says we must interpret these exculpatory clauses against the drafter, against the maker. They must be specific if they are going to try to exclude something. And Tyler and Burwine stand for this proposition that we are submitting to this court, this proposition and this one only. Our negligence claim arises from independent duties. It doesn't arise from contract. It arises from independent duties, and therefore, unless they spell out in their contract, you shall have no negligence claim, you shall have no strict liability claim, you shall have no other tort claim. Unless it's spelled out specifically, the negligence action survives these boilerplate exculpatory clauses. That's what we request this court to do. And the Burwine case has a number of factors which are nearly identical to this case, nearly identical. When they talk about, first, it only applies to warranty. Second, the provision in Burwine, liability under this contract is limited. Understand that. And that's what we suggest the ruling should be so limited to. Only limit liability under the contract. Do not take away our negligence claim. Do not limit our negligence claim. And this is directly from Burwine and couldn't be closer. Third, the court says, the exculpatory language does not contain the words negligence or tort or any cognates of those terms. And there is none in our contract. There is no limitation on strict liability claims, tort claims, negligence claims in our contract. So we respectfully request this court to follow, not just Burwine, but follow the Tyler case. And in an analysis, hold these exculpatory clauses under the standards they must be interpreted in favor of the city of Ottawa and against osmotics. Meaning, you don't hold everything against them, but when you're interpreting the language, when you're looking at the language, you must lean towards favoring non-exculpation unless it is expressly spelled out. And there is no tort claim carved out or disclaimed or limited here. Now, the 3.6, to be, there's one more argument I want to make on this. 3.6 in these warranty claims, under the warranty provisions, talks about limiting liability. It's not so much an exculpatory clause, but it says limiting liability. And there it says that the exposure of the seller, which is osmotics, to us shall in no event be greater than the purchase price. Well, frankly, if you interpret that one against osmotics and in favor of the city of Ottawa, we clearly have a claim back against them for an amount that we can seek at least to the amount of the purchase price. So their own language of their limiting clause favors us, allows us to proceed at least to some extent, at least to the extent of the contract price, which is $130,000 or $186,000, something like that. Now, that's what I have to say about the osmotics issue. I would like to move on, since I have limited time, and talk about what I think is important on the second issue, and that is the issue regarding the architect, Vaselay, a wholly different issue than the contract claim that's involved with osmotics. The Vaselay claim was ruled on at a summary judgment by Judge Lanuti at the trial court. After some depositions and in the face of an affidavit that we ultimately presented, and which is on file, which is of record before Judge Lanuti, but he still ruled summary judgment in favor of the architect, which I think flies in the face of all summary judgment standards. Summary judgment just requires some evidence for question of fact to go to the jury, and we think it's here on two levels. Let me talk about the facts, which I think are crucially important on the Vaselay summary judgment, and these facts are undisputed. Recall that there are, I hope the court can still hear me if I back away a little bit from the microphone, recall there are two distinct and separate buildings, which is crucial in this case. There's this brand new building with all the new water pipes in it and everything, and then there's the old building that got renovated, which is the office building, and the key is that there is a corridor that never existed before, a corridor designed and built between these two by Vaselay and Vaselay only, by George Carey, who worked for Vaselay, and him only. Mr. Carey gave his deposition, and he said this, and these, I think, well, certainly they're undisputed, but I think they also raise a question of fact in and of themselves. Mr. Carey says this, I know in this new building we're designing there's a bunch of water pipes and it's water under pressure, it's a water treatment plant. I also know from my experience that every time you have a commercial building with a floor, there's two types of drain systems that should be in there, a big drain running along the middle so that water flows from the sides toward the middle, or if you don't do that, two drains big along the two edges of the building with a slight grade toward the edges so that there's drainage in that commercial building. And he admits he knows they did not exist in the water treatment plant. They did not exist there. Now, he didn't design those drains, but the key is he knew they weren't there. Then what does he do? And here's where his negligence comes into play. And this is the only issue we're going at against the architects. Don't be misled about, well, the pipe busted, Carey didn't design the pipes, therefore Baselay gets out. That's not what we're seeking against them. With all his knowledge, what does he do? Say, for example, this whole room that we're all in now is the water plant with all the water pipes. He opens a doorway. It's a solid wall before. He busts a hole in the doorway and designs a downward-sloping corridor to our old existing building. And he and I debated in his deposition. His deposition is fairly long. It's in the record. I argued. Of course, I'm an advocate. I said, that's designed like a gutter. It goes downhill, and it has sides, and it could carry water downhill to the existing office building. And he debated with me. He goes, well, don't call it a gutter, Mr. Fleming. I understand. I understand. But he's the only one to design, open a hole, a doorway opening, and design a downward-sloping gutter-type corridor to our office building when he knew there was inadequate drainage in the new water treatment plant building with water under pressure. Now, it's our position, his testimony in and of itself sets the standard, and a jury could determine maybe that's wrong. Maybe that's bad. Water goes downhill. He knows there's a lot of water. He knows himself there's inadequate drainage, but he still opens that corridor and designs it downhill, sloping downhill. We think that's sufficient to raise a question of the fact to the jury. We had a summary judgment hearing. Judge Lanuti, for whatever reasons, he decided to grant them summary judgment, and we didn't know if we'd need an expert or not. And they met. We got an expert affidavit, put that expert affidavit on file, and Judge Lanuti says, still, I am still going to grant them summary judgment. It is our position, under Mr. Carey's testimony alone, there's a question of fact for the jury. But further, moreover, there is an affidavit already on file in the trial court record saying that what Mr. Carey did violated the standard of care, and that was before Judge Lanuti, and still he granted the summary judgment. We submit wrongfully so. The affidavit was in lieu of the deposition. For Mr. Gabb. For Mr. Gabb. Not for Mr. Carey, but for Mr. Gabb. Yes, Your Honor. In compliance with Supreme Court Rule 191, it is our position. Therefore, what we pray for is that this court, number one, allow the city of Ottawa to proceed against osmotics on a negligence claim that is not exculpated, and number two, to reverse the summary judgment against Basile and let that go to the jury for a question of fact, and whether that was a negligent act for him to bust that hole in that wall, put a downward-sloping gutter or corridor in the face of his knowledge. That's our request to this court. I don't believe there are any questions. Thank you, Mr. Fleming. Thank you. Mr. Byrd, I believe you've reserved seven and a half minutes in response. Correct, Your Honor. Fleming. Fleming. My name is Greg Byrd, B-I-R-D. I represent Basile Carey and Allstat. Mr. Carey is here today. I've got a couple of observations, a couple of comments, and we'll go from there. First of all, I don't want any of you to be misled. This is a segregation action. If there's any concern on your part about the taxpayers of Ottawa or the citizens of Ottawa somehow being out of pocket on this one, you don't need to worry about that. I don't know if it's proper to object. That's a misstatement. That is absolutely a misstatement. I object. It's in the record, and you can look at it. Secondly, objection will be noted for the record. The court will take notice of the objection. Secondly, you folks live and practice in a small jurisdiction. I live in Frankfort, practice primarily in Chicago. This case is important to Mr. Carey because he is a citizen and a professional in this area, and that is why he's here today, and that's why we're here representing him. Basile Carey and Allstat had a contract with McClure Engineering to design the building envelope. The bricks that you see on that building that match the old building. They didn't design the guts of the building. In the contract, it clearly states, Basile Carey's duties, architectural design and construction documents, mechanical, electrical, plumbing, structural, and civil engineering to be provided by McClure. That's the guts of the building that counsel's complaining about. Additionally in the record, there is the affidavit of Mr. Novotny, the principal of McClure, and he says, I never contracted with George Carey about plumbing, flood control, or anything else. We just want him to make the big building, the new big building, match the old aesthetically pleasing building. That's over here. He's saying his argument, as I understand it today, is that there's this corridor, an enclosed connection between the two buildings? That is correct, Your Honor. Okay, and that is an awareness on the part of Basile that there is no drainage, and yet there is a design that has an elevation issue that flows water into the other building, if and when? Indeed, Judge, in the record of 1072 and 1073, there is an indication that there is a drain in the building as part of McClure's work. Unfortunately, when those hundreds of thousands of gallons came out of those pipes, it overwhelmed the one small drain that was present there. I understand your argument, sir. Once again, were we responsible for designing that corridor between the two buildings? Absolutely. That's what we were retained to do. But we were not retained in any way, shape, or form to prognosticate about or provide for what most people admitted, you need a Grand Canyon of a drain in there to stop this flood. I mean, the amount of water in there went out into the streets, into the building, filled the building up, went out of the building. Not quite biblical proportions, but a pretty good flood. So you're saying there doesn't even need to be an expert to know there's inadequate drainage? I beg your pardon, Your Honor? You're saying then there doesn't even need to be an expert to know there's inadequate drainage for that amount of volume of water under pressure? No, I say there needs to be an expert, and I will get to that in a minute. There's been no testimony that he violated standard of care of an architect in this area regarding his contractual undertakings, and I will get to Mr. Gavin's affidavit in a second. It is undisputed, Your Honor, that that flood was caused by a misglued flange by Tobin. It blows out, and I believe on the 10-inch pipe floods the whole area. The Gavin affidavit is, this is interesting, and I'd like to give you a timeline for this just so you know. Basley files its motion for summary judgment on May 18, 2009. On September 17, 2009, Judge Lanuti orders disclosure of Iowa's experts by 11-1-09. On 10-29-09, Iowa files a motion which states in part, although plaintiff originally anticipated the necessity of hiring an architectural expert in order to respond to Basley's motion for summary judgment, based upon further analysis of these depositions, primarily the deposition of George Carey, plaintiff believes it is not necessary to expend funds to retain an architectural expert at this time. However, such retention might become necessary as the case develops. 12-23-09, Iowa files its response to our motion for summary judgment without any affidavit. 1-22-10, Judge Lanuti grants the motion for summary judgment. 2-11-10, Iowa files its motion to reconsider. And then finally, on April 29, 2010, Iowa files a supplemental motion to reconsider, where, at that point in time, Mr. Gavin's affidavit finally shows up, after the hearing on the motion for summary judgment has been had. Gallman v. The City of Springfield, Condition v. Cause, and I believe it goes to your questions, Your Honor. The independent act of Togan in misgluing this flange that blows up and puts the water in the building is the proximate cause of this damage to the city. I would agree with Your Honor that if Mr. Carey was responsible for the design of that building, the new water treatment plant, the guts of it, that there might be a question of fact regarding should a competent architect who undertook that responsibility, should he have planned for it. But once again, Your Honor, it's uncontested that what Mr. Carey was hired to do on a very limited basis was to design the envelope of that building. Counsel, you have two minutes. I beg your pardon? Two minutes. Thank you. But if the envelope includes the walkway, then isn't it incumbent upon whoever has got the contract to do the walkway and to make sure that it is built in consideration of the design of the building it's connecting? I mean, you know, if you know going in there's not enough drainage, shouldn't you build your connection or your... Your Honor, once again, if we were responsible for plumbing and flood control, I would agree with you that that should be a concern. Perhaps those questions are better directed to McClure, which retained those responsibilities. However, I think your question also leads to the foreseeability issue of is it really foreseeable that a flange is going to fail and put 100,000 gallons of water into this building? And is my client's conduct a proximate cause of the damages sustained? Regarding Judge Lanuti not taking Gavin's affidavit into account, there was a proposed amended complaint in the negligence count after judgment had been entered. It's an abuse of discretion standard, and I don't believe Judge Lanuti abused any discretion. They had a full hearing. They had their chance. What they're looking at now is a second bite of the apple after it's all been done. That shouldn't be confidence by this court for one reason and one reason alone. If that's the law, there's never going to be a motion for summary judgment, and you can always come back with an expert or some other evidence that you can create after you've had your hearing. Simply not the law in Illinois. And I would ask respectfully that you not, excuse me, allow that to happen in this case. I think I've probably got 30 seconds left. I'm going to take Samuel Clemons' advice and say, if you don't have any other questions for me, I'm going to sit down and be quiet. I think you can sit down and be quiet. Thank you, Your Honor. Mr. Chemers, I believe you represent Osmonix. I do. Good morning, Your Honor. May it please the Court. For Defendant Appleby Osmonix, Robert Chemers from Prince of Stoufford, Chicago. Counsel. Counsel. De novo review of a motion for summary judgment doesn't include what Mr. Fleming would add as a condition, and that is whether the motion was granted hastily. That was how he described the ruling in favor of my client by the trial court. I dare say that each time I've argued in this court from a judgment that was entered by Judge Lanuti, it has been affirmed. I think he has a respectable record here, and I think that this record is no different. We have a situation where, depending on what aspect of the contract is being looked at by the plaintiff, they rely on a different case. If I cited a federal case, then federal court cases are not binding precedent on this court, which we all know, but when it serves their purpose, they cite a case like Berwyn, which is a federal case. Berwyn has a test in it for the applicability of an exculpatory clause. Strict construction, every intent against the party seeking immunity, and that it spells out the intent with greatest particularity. That contract in Berwyn didn't mention negligence, and the court in Berwyn, the page after what was referred to by Mr. Fleming, stated, and this is at 532 Fed Second, at 8, despite these strict rules of construction, and those are the three I just mentioned, despite these strict rules of construction, however, a specific reference to quote unquote negligence or its cognates is not required. That's the linchpin of this case. You can look at the warranty and claim provision of the osmotics contract. The word negligence is not there. But what is there? What is there is, and by the way, this was a contract put out to bid with a number of bidders. My client had the bid that was accepted by the city. The city accepted the terms and conditions of the contract, and dare say the city was able to read and understand the contract, even the big terms which slipped up the attorney from Peoria. That having been said, we have a limited warranty, an exclusive remedy, and an express disclaimer of all other warranties, and an express disclaimer of incidental and consequential damages. The courts have said, and there are a lot of cases on this, I'm sure the court's going to look at Gates and Arkwright and Pargus and Tyler and Burwood, and look at what they say. You have to read the contract as a whole. And when your honors read this contract and read Section 3 and its subparts, you'll note and you'll see that it has a limited warranty, and this claim was made far outside the warranty period because the warranty was limited to either 12 months or 15 months. The contract was received in 2001. This flange bursting, as was described by the two attorneys who preceded me up here, occurred in February of 2004, long outside the warranty period. Also, there is a provision in this contract that calls for exclusive remedy, that the remedy stated herein, that's in 3.6, the remedies provided herein are exclusive, and seller, that's my client, shall incur no liability other than stated herein. Now, it's the plaintiff's argument, if I understand it, that because that is not set out separately and is in a provision that talks about damages, that it's not a limitation on, for example, a negligence claim. Other courts, looking at almost identical language, and I mentioned half a dozen of them, have held that even without the word negligence in the contract, that type of a limitation would limit and preclude an action against that seller for negligence. We heard about the Berwyn test factors from Mr. Fleming. There are five of them. They are distinguishable. Berwyn on its facts is distinguishable, but unlike this case, which involves two commercially sophisticated parties to a contract, put out to bid, review bids, accept the contract, Berwyn involved an exculpatory provision put on the back of a seller's price quotation. Vastly different than this type of a contract. Also, the exculpatory provision in Berwyn was under the heading warranty. Here, 3.0, which is found at pages 3 to 5 of my brief, the blue cover brief, or I believe it's page 311 of the record, is under the heading warranty and claims. Warranty and claims in connection with all of the subparagraphs of 3.0. Also, unlike Berwyn, this contract does not include a limitation clause, quote, unquote, under this contract, which was so prominently an issue in Berwyn and in this court's decision in Tyler Enterprises. Also, Illinois law recognizes that the word negligence need not appear in the exculpatory provision. Berwyn itself recognized that. Tyler recognized that. Tyler recognized that, and the word negligence was there, but they held that didn't apply, this court, to a strict liability claim. Also, Berwyn says one of the tests is if the exculpatory provision would be superfluous if not applied to bar a negligence claim. Throughout the briefs, the plaintiff's opening brief and the plaintiff's reply brief, they apply a test of superfluity, or whether it's superfluous, that's easier to say, to 3.3. They ignore 3.6. 3.3 is the express disclaimer of incidental or consequential damages, unmistakably clear. This is not a contract they're saying is a contract of adhesion that they didn't understand, that was forced upon them, that was not negotiated, or that is somehow not clear and unambiguous. They don't apply the test of superfluity to 3.6, and clearly, 3.3 or 3.6, to say that that does not preclude a negligence cause of action would be to read those provisions out of the contract. Thank you. And when that analysis is done, even a case like Gates would recognize that not to say a negligence claim is barred would render the exclusive remedy provision superfluous. It says, admonish shall incur no liability other than stated herein. Well, that is a complete limitation on the basis of a claim. The plaintiff doesn't address it. Ottawa excised 3.6 from the contract. The other Burwins factor, the last one, is consequential damages are not limited to contract damages. Well, the case law is to the contrary. The case law has recognized and recited all these cases, Pargus, Arkwright, Gates, Burwin, Tyler. The consequential damages include damages that would result from a tort. Paragraph 9 of the complaint filed by the city indicates the city seeks recovery of more than $149,000 for consequential property damage from osmotics. The plaintiff's complaint contradicts its argument that the damages it seeks from osmotics are not precluded by the contract. For all these reasons, find your honors the noble review of these issues. We'd ask the court to affirm the judgment, not a hastily entered judgment, but a judgment that was entered by the court below because there is no question of fact. In fact, there's no contention there's a question of fact. This case was decided as a question of law. So arguably, they must be saying that Judge Lanuti got it wrong when he said the exclusive remedy provision in this contract precluded a negligence claim. Bear in mind, we got summary judgment on three counts. We're only here on one of those counts because they've abandoned the appeal on the other two. They're not complaining about the judgment on the contract and warranty count. Only the negligence count. That having been said, we'd ask this court to affirm the judgment and enforce notice. Any questions? I don't believe there are. Thank you, Mr. Chambers. Mr. Fleming, you may respond. Thank you. I will briefly respond. First of all, on the contract issues regarding osmonics as raised by Mr. Chambers, he tries to say, well, you don't need to include the word negligence in there in the exclusion to somehow exclude negligence. Well, the case law has that as general boilerplate. Okay, you don't have to have the word negligence, but we're going to look closely and see if you try to exclude tort-type claims. And to address that precisely, I think you need to look no further than the Tyler case. The Tyler case had an exculpatory clause that says, in no event shall a lanco be liable for consequential damages whether or not arising out of negligence. It included the word negligence, and the appellate court in that case did as it should do under contract interpretation rules and say, okay, we'll use the word negligence, but we're going to limit that term to negligence, and they allowed a strict liability claim. That's what you're supposed to do is you're supposed to interpret the exculpatory clause very narrowly in favor of the city of Ottawa and against a party that's trying to get out, that's trying to get out from liability. So then look at the contract in our case. It doesn't say tort. It doesn't say negligence. It doesn't say strict liability. There is no exclusion of tort claims in our osmotic contract, and that should answer the day. The one thing that I want to say in response on the Basile issue is there is some complaint by them, even though the Gavin affidavit is on file, some kind of complaint from them that Judge Lanuti exercised his discretion properly. Well, we cited some case law to talk about exercise of discretion, and I point out two things. First of all, there was no motion filed by them to strike Gavin's affidavit of any kind, and there is no complaint from them that Gavin's affidavit caused them some prejudice. That would be the time when a court could properly strike an affidavit or a witness if you're on the eve of trial, if you're a week before trial and someone doesn't have enough time to get done what they need to get done. That's just not the case here. That's not the case here at all. We never even had a trial date in this case. So I submit that Judge Lanuti did, first of all, ignore the affidavit wholly, and if this court is going to find that he somehow struck the affidavit, well, that was an abuse of discretion. So anyway, that's all I have to say on rebuttal, unless there's further questions. Thank you very much. Thank you, Mr. Fleming. Thank you, counsel, all, for your arguments in this matter this morning. It will be taken under advisement, and a written disposition shall issue. The court will stand in recess until no, for a panel change.